**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

PHOENICIA SPORTS & ENTERTAINMENT, LLC,     :     CIVIL ACTION
                                    Plaintiff,     :
                                                  :
    v.                                                  :
                                                  :
NEW YORK COSMOS, LLC,     :
                                 Defendant.     :     NO. 12-cv-00772
                                                  :

## <u>MEMORANDUM RE: DEFENDANT'S MOTION TO DISMISS, OR IN THE ALTERNATIVE, TO TRANSFER VENUE</u>

**Baylson, J.**                                        **August 2, 2012**

## I.    Introduction

        Plaintiff Phoenicia Sports & Entertainment, LLC ("Phoenicia") brings this action against Defendant New York Cosmos, LLC ("Cosmos") for breach of contract.  Cosmos moves to dismiss Plaintiff's Complaint pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6).  In the alternative, Cosmos moves to transfer venue pursuant to 28 U.S.C. § 1404(a).  For the following reasons, Cosmos's Motion will be DENIED.

## II.    Factual and Procedural History

        The following facts are alleged in the Complaint, contained within documents attached to the Complaint, or the product of jurisdictional discovery ordered by the Court.  <u>See</u> <u>In re Burlington Coat Factory Sec. Litig.</u>, 114 F.3d 1410, 1426 (3d Cir. 1997) ("[A] document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment.") (internal quotation marks and alteration omitted); <u>Dayhoff Inc. v. H.J. Heinz Co.</u>, 86 F.3d 1287, 1302 (3d Cir. 1996) ("[O]nce a defendant has raised a jurisdictional defense, a plaintiff bears the burden of proving by affidavits or other

competent evidence that jurisdiction is proper.").

Phoenicia is a Pennsylvania corporation that provides marketing, management, and sponsorship services to members of the sports and entertainment industry.  Compl. ¶¶ 1, 3.  Its principal office is located in Bethlehem, Pennsylvania.  Compl. ¶ 1.  Christopher Lencheski, President of Phoenicia, lives in Center Valley, Pennsylvania, and conducts much of his work for Phoenicia either from his home or from the office in Bethlehem.  Lencheski Aff. ¶ 3.

Cosmos is a Delaware corporation that owns and manages the New York Cosmos professional soccer club.  Compl. ¶ 4; Removal Notice ¶ 5.  Cosmos's only office is located in New York, New York.  Compl. ¶ 2; Fraga Dep. 40:6-24.  Cosmos does not have any employees in Pennsylvania.  Fraga Dep. 40:25-41:4.

In January and February of 2011, Phoenicia entered into negotiations with Cosmos to provide it with various marketing and sponsorship opportunities.  Compl. ¶ 6.  Mr. Lencheski traveled to New York at least twice to meet with Cosmos and their executive director, Joseph Fraga, as part of these negotiations.  Fraga Dep. 21:13-21:22; 41:5-43:16.  On February 18, 2011, Phoenicia sent a contract proposal to Cosmos (the "February 18 Proposal") regarding a possible long-term relationship, but Cosmos never signed it or otherwise agreed to it. Compl. ¶¶ 6-7, Ex. 1.  The negotiations culminated without resolution.

Phoenicia had a client, the Justice Entertainment Group ("JEG"), which provided sports and entertainment opportunities in Las Vegas.  Compl. ¶ 8.  In February and March of 2011, Phoenicia and Cosmos negotiated a new, narrower agreement in which Phoenicia would facilitate a contract between Cosmos and JEG in return for a specified commission.  Compl. ¶ 9; Lencheski Aff. ¶ 3.  These negotiations consisted mainly of at least twelve phone calls between

Mr. Fraga, working in New York, and Mr. Lencheski, working in Pennsylvania.  Lencheski Aff. ¶ 3; Fraga Dep. 21:23-22:20.  Mr. Fraga knew that Mr. Lencheski was in Pennsylvania during these calls.  Fraga Dep. 21:23-22:20.

As a result of these telephone negotiations, Fraga (on behalf of Cosmos) and Lencheski (on behalf of Phoenicia) entered into an oral agreement providing that Phoenicia would be paid a 20% commission of gross revenue for "putting Cosmos together" with JEG to produce soccer events in Las Vegas.  Compl. ¶ 9.  Phoenicia also offered to lower its commission to 10% if Cosmos agreed to the long-term February 18 Proposal within five business days of any contract entered into between Cosmos and JEG.  Compl. ¶ 9.

On March 25, 2011, Phoenicia sent Cosmos an email that read, in part:

> Please allow this email to serve as written confirmation of our verbal agreement that Phoenicia Sports & Entertainment, LLC will receive a 20% commission on gross revenue from the present opportunity for the Las Vegas match event with our client Justice Entertainment Group and Cosmos, as fee for joining the two parties together in a mutually beneficial arrangement for the event.  However, should you become a full time client of Phoenicia, as would be evidenced by agreeing to and signing our proposal for services as sent to you and your executive management on February 17th,[1] then the commission due Phoenicia on the aforementioned transaction will be reduced to 10% on gross revenue as is our common courtesy to existing clients.  The latter opportunity for a reduced commission for services rendered would need to be exercised within five (5) business days of acceptance of Phoenicia's clients' Las Vegas match event Offer Letter.

Compl. Ex. 2.

On March 30, 2011, Mr. Fraga, on behalf of Cosmos, responded by sending an email to Mr. Lencheski that stated, in relevant part, "The arrangement below has been reviewed and

---

[1] Phoenicia dated its contract proposal February 17th, but did not send it to Cosmos until February 18th.

accepted by our management.  I will also need [sic] review the term sheet with you once more before engaging your client in this endeavor."  Compl. Ex. 2.

Following the March 30th email, Phoenicia orchestrated negotiations between Cosmos and JEG.  Lencheski Aff. ¶ 5.  During these negotiations, Cosmos operated from its office in New York, JEG operated in Nevada, and Phoenicia operated mainly from Pennsylvania.  Lencheski Aff. ¶ 5.  Phoenicia's role in the negotiations consisted of, among other things, forwarding contract proposals from JEG to Cosmos and initiating weekly telephone conferences.  Fraga Dep. 26:17-32:5.  During the negotiations, Mr. Fraga also sent emails to Mr. Lencheski, although he never physically entered Pennsylvania.  Fraga Dep. 33:11-34:4.  While Mr. Fraga did not know where Phoenicia employees were at the time of these telephone calls and emails, he knew that Phoenicia did much of its work out of its Bethlehem, Pennsylvania office.  Fraga Dep. 26:17-32:5.

As a result of Phoenicia's efforts, Cosmos and JEG agreed to a letter of intent on April 7, 2011.  Compl. ¶ 11; Lencheski Aff. ¶¶ 5-6.  The letter stipulated that Cosmos would receive $1,000,000 a year for three years in exchange for participating in various soccer events in Las Vegas.  Compl. ¶ 11, Ex. 3.  On May 11, 2011, Cosmos and JEG entered into a formal written agreement based on the letter of intent.  Compl. ¶ 12.  Pursuant to the oral agreement between Phoenicia and Cosmos, Cosmos had five days to agree to the February 18 Proposal to reduce Phoenicia's commission from 20% to 10%.  They did not do so.  Compl. ¶ 14.

An initial payment of $250,000.00 was paid to Cosmos by JEG pursuant to the terms of the May 11, 2011 contract.  Compl. ¶ 15.  Phoenicia invoiced Cosmos for 20% of the $250,000.00, or $50,000.00, on or about June 13, 2011.  Compl. ¶ 15, Ex. 5.  Phoenicia listed its

Bethlehem, Pennsylvania address on the invoice.  Compl. Ex. 5.  Cosmos then paid Phoenicia the

$50,000.00 balance by hand delivering a check to Mr. Lencheski while he was in New York City.

Compl. ¶ 16; Lencheski Aff. ¶ 6.

On October 28, 2011, Cosmos unilaterally cancelled the May 11 contract with JEG days

before the next payment of $750,000.00 was due.  Compl. ¶ 17, Ex. 6.  Phoenicia demanded

payment from Cosmos for the remaining commission fees ($550,000.00)[2], but Cosmos refused.

Compl. ¶¶ 23-24.

Phoenicia brought suit against Cosmos in the Northampton County Court of Common

Pleas for breach of contract.  Compl. ¶ 25.  Specifically, Phoenicia alleged that by cancelling the

contract with JEG (which reduced the expected gross revenue), and by refusing to pay Phoenicia

its earned commission, Cosmos has breached its contract with Phoenicia.

On February 14, 2012, Cosmos removed the case to this Court.  (ECF No. 1).  On March

13, 2012, Cosmos filed a Motion to Dismiss.  (ECF No. 8).  On March 16, 2012, Phoenicia filed

a motion for discovery related to the issue of personal jurisdiction, which the Court granted on

April 2, 2012.  (ECF No. 13).  As part of that discovery, the parties deposed Mr. Fraga.

Phoenicia then filed a timely response to the Motion, and Cosmos timely replied.  (ECF Nos. 18-

19).

## III.    Summary of Cosmos's Motion

Cosmos first seeks dismissal for lack of personal jurisdiction under Rule 12(b)(2).

Cosmos contends that it does not have the minimum contacts with Pennsylvania necessary for

---

[2] $550,000.00 is 20% of $2,750,000.00, the gross revenue that Cosmos would have
received from JEG had they not cancelled the contract.

the exercise of specific jurisdiction.  Additionally, Cosmos claims that it would be unduly

burdened by having to litigate in Pennsylvania, rather than its home forum of New York.  In the

alternative, Cosmos moves to transfer the case to the Southern District of New York.

Cosmos also moves to dismiss the Complaint under Rule 12(b)(6).  Cosmos argues that

the New York Statute of Frauds bars Phoenicia's breach of contract claim because the alleged

contract is an oral agreement which (1) could not be performed within one year; (2) is for

commission in exchange for negotiating a business opportunity; and (3) is not sufficiently

memorialized in writing.

Additionally, Cosmos claims that the alleged oral agreement is unenforceable because it

is indefinite as to its material terms.  Specifically, Cosmos contends that the failure to define

"gross revenue" renders the fee ambiguous and that the existence of two compensation structures

renders the alleged contract an unenforceable agreement to agree.

## IV.    Legal Standard

### A.    Motion to Dismiss for Lack of Personal Jurisdiction

When deciding a motion to dismiss for lack of personal jurisdiction pursuant to Federal

Rule of Civil Procedure 12(b)(2), the court is required to take all of plaintiff's factual allegations

as true and to resolve all factual disputes in plaintiff's favor.  Metcalfe v. Renaissance Marine,

Inc., 566 F.3d 324, 330 (3d Cir. 2009).  Once a jurisdictional defense is raised, the plaintiff bears

the burden of proving, through affidavits or other competent evidence, sufficient contacts with

the forum state to establish personal jurisdiction.  Id.  When the district court does not hold an

evidentiary hearing, the plaintiff must establish only a prima facie case of personal jurisdiction to

proceed with the case.  Eurofins Pharma U.S. Holdings v. BioAlliance Pharma SA, 623 F.3d 147,

155 (3d Cir. 2010).[3]  The burden then shifts to the defendant to establish that the exercise of

jurisdiction would be unreasonable.  See Carteret, 954 F.2d at 150 (citing Burger King Corp. v.

Rudzewicz, 471 U.S. 462, 477 (1985)).

> ### B.   Motion to Dismiss for Failure to State a Claim

Under the notice pleading requirements of Federal Rule of Civil Procedure 8(a)(2), a

complaint must contain only "a short and plain statement of the claim showing that the pleader is

entitled to relief."  To survive a motion to dismiss for failure to state a claim pursuant to Federal

Rule of Civil Procedure 12(b)(6), the complaint must plead sufficient factual allegations, that,

taken as a whole, state a facially plausible claim to relief.  Bell Atl. Corp. v. Twombly, 550 U.S.

544, 570 (2007).  A complaint satisfies the threshold of facial plausibility if "the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged."  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (citing Twombly,

550 U.S. at 556).  "Threadbare recitals of the elements of a cause of action, supported by mere

conclusory statements," are insufficient to establish plausible allegations to survive the motion.

---

[3] There has not been an evidentiary hearing in this case, nor has one been requested by either party.  When there is an evidentiary hearing, a plaintiff must demonstrate minimum contacts by a preponderance of the evidence.  LaSala v. Marfin Popular Bank Public Co., Ltd., 410 F. App'x 474, 476 (3d Cir. 2011).  These contrasting standards applied to 12(b)(2) motions mirror the "facial attack versus factual attack" evidentiary standards applied to 12(b)(1) motions. See Carteret Sav. Bank, FA v. Shushan, 954 F.2d 141, 142 n.1 (3d Cir. 1992) (adopting the contrasting 12(b)(2) standards from Marine Midland Bank, N.A. v. Miller, 664 F.2d 899, 904 (2d Cir. 1981)); see also Marine Midland, 664 F.2d at 904 ("If the court chooses not to conduct a full-blown evidentiary hearing on the [12(b)(2)] motion, the plaintiff need make only a prima facie showing of jurisdiction . . . [T]he plaintiff must establish jurisdiction by a preponderance of the evidence, either at a pretrial evidentiary hearing or at trial."); Gould Elecs. Inc. v. U.S., 220 F.3d 169, 176 (3d Cir. 2000) (explaining that, when considering a 12(b)(1) motion to dismiss, the complaint is considered true for a facial attack on the sufficiency of the pleadings while other evidence is considered when evaluating a factual attack on the truth of the allegations).

Id. At 1949 (citing Twombly, 550 U.S. at 555).

In analyzing the complaint, the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Phillips v. Cnty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (internal quotation marks omitted). However, the court may disregard any legal conclusions in the complaint. Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009) (citing Iqbal, 129 S. Ct. at 1949).

Generally, the district court may consider only the facts alleged in the complaint and its attachments on a motion to dismiss. Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994). The court may also consider any document "integral to or explicitly relied upon in the complaint." In re Burlington Coat Factory Sec. Litig., 114 F.3d at 1426 (internal citations omitted). Finally, "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document" may be considered without converting the motion to one of summary judgment. Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993).

**V.    Discussion**

   **A.    Personal Jurisdiction**

Federal Rule of Civil Procedure 4(k) authorizes a federal district court to assert personal jurisdiction over a non-resident defendant to the extent permitted by the law of the state where that court sits. See O'Connor v. Sandy Lane Hotel Co., 496 F.3d 312, 316 (3d Cir. 2007). The court must first determine whether there is a statutory basis for the exercise of jurisdiction, and must then analyze whether exercising jurisdiction would exceed the limits of the Due Process

Clause of the Fourteenth Amendment.  Eurofins, 623 F.3d at 155.  The Pennsylvania long-arm statute authorizes jurisdiction over persons "to the fullest extent allowed under the Constitution of the United States and may be based on the most minimum contact with this Commonwealth allowed under the Constitution of the United States."  42 Pa. Stat. Ann. § 5322(b) (West 2012). The analysis here thus collapses into one inquiry: whether Defendant has "certain minimum contacts with [Pennsylvania] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."  Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (internal quotation marks omitted).

There are two types of personal jurisdiction: general jurisdiction and specific jurisdiction. See Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 nn.8-9 (1984). Phoenicia conceded in its brief that Cosmos lacks the contacts necessary to support general jurisdiction, see Pl.'s Br. at 1, so this Court only considers specific jurisdiction here.

The test for specific jurisdiction is satisfied where (1) a defendant purposefully directed activities at the forum state, (2) the claim arises out of or is related to those activities, and (3) the court's exercise of jurisdiction would not offend traditional notions of fair play and substantial justice.  D'Jamoos ex rel. Estate of Weingeroff v. Pilatus Aircraft Ltd., 566 F.3d 94, 102 (3d Cir. 2009) (citing Burger King, 471 U.S. at 472, 476; Helicopteros, 466 U.S. at 414).

### 1.    Minimum Contacts

In analyzing specific jurisdiction in the context of a breach of contract claim, district courts consider "whether the defendant's contacts with the forum were instrumental in either the formation of the contract or its breach."  Gen. Elec. Co. v. Deutz AG, 270 F.3d 144, 150 (3d Cir. 2001).  By creating "continuing obligations between [themselves] and residents of the forum**,**"

parties may purposely avail themselves of the forum state.  <u>Burger King</u>, 471 U.S. at 476.  The

mere existence of a contract, however, "is insufficient to establish minimum contacts."  <u>Metcalfe</u>,

566 F.3d at 333 n.7.  The court evaluates "the totality of the circumstances, including the location

and character of the contract negotiations, the terms of the contract, and the parties' actual course

of dealing."  <u>Remick v. Manfredy</u>, 238 F.3d 248, 256 (3d Cir. 2001).

Jurisdiction may be asserted even when a party does not physically enter the forum state.

<u>Burger King</u>, 471 U.S. at 476.  Although physical presence will generally enhance a party's

contacts with the forum state, "it is an inescapable fact of modern commercial life that a

substantial amount of business is transacted solely by mail and wire communications across state

lines, thus obviating the need for physical presence within a State in which business is

conducted."  <u>Id.</u>

In this case, the Court finds that Cosmos purposefully directed its activities at the forum

state of Pennsylvania.  Cosmos participated in numerous negotiations by telephone and email

with Phoenicia, which was operating from Pennsylvania.  These negotiations led to the oral

agreement at issue.

Cosmos maintained contacts in Pennsylvania during the performance of the oral

agreement as well—that is, Cosmos participated in weekly telephone conferences with Phoenicia

employees located in Pennsylvania in the period leading up to the May 11, 2011 contract

between Cosmos and JEG.  Indeed, Mr. Fraga (located in New York) sent emails to Mr.

Lencheski (located in Pennsylvania) as part of the ongoing negotiations with JEG and Phoenicia.

The combination of the oral agreement and the May 11, 2011 contract obligated Cosmos to pay

Phoenicia "20% commission on gross revenue" over three years**.**  Cosmos created both

"continuing obligations" to a Pennsylvania company and  contacts with Pennsylvania that were "instrumental in [both] the formation of the contract [and] its breach." Gen. Elec. Co., 270 F.3d at 150.  Cosmos thus purposefully directed its activities towards the forum state of Pennsylvania.

This case is much like Grand Entm't Grp. v. Star Media Sales, Inc., which the Court finds instructive.  988 F.2d 476, 482-83 (3d Cir. 1993).  In Grand Entm't Grp., the court held that a foreign corporation established minimum contacts with Pennsylvania despite the fact that its agents never physically entered the state.  Id.  The contacts consisted of contract negotiations conducted by telex and telephone calls between the plaintiff, acting in Pennsylvania, and the defendant, acting from Spain and Los Angeles.  Id.  By directing "at least twelve [telex] communications to the forum" and initiating "numerous contacts . . . over the telephone and through the mails," the defendant purposefully directed its activities towards Pennsylvania.  Id.

Similarly, in O'Connor, a hotel in Barbados established minimum contacts with Pennsylvania by sending mail to and trading phone calls with Pennsylvania residents.  496 F.3d at 318.  Following the plaintiffs' initial stay at the hotel, the defendant sent seasonal newsletters to their Pennsylvania home.  Id. at 315.  A year later, the plaintiffs booked another reservation with the hotel.  Id. at 316.  The hotel then mailed them a brochure with information on spa treatments offered by the hotel.  Id.  The plaintiffs decided to purchase several treatments, and made arrangements via telephone calls both to and from the defendant.  Id.  Through these acts, the defendant "deliberately reached into Pennsylvania to target two of its citizens."  Id. at 318.

Cosmos' argument that phone calls and letters alone cannot create minimum contacts is unavailing, as the Supreme Court and the Third Circuit have directly contradicted this contention. See, e.g., Burger King, 471 U.S. at 476; O'Connor, 496 F.3d at 318 (holding that mail and

telephone calls directed at the forum constituted minimum contacts).

Cosmos also contends that it did not have knowledge that Phoenicia was a Pennsylvania company or that Phoenicia was operating principally from Pennsylvania.  The factual record produced during jurisdictional discovery contradicts this assertion.  Mr. Fraga, the executive director of Cosmos at the time of these events, knew that Phoenicia had an office in Bethlehem, Pennsylvania, and that Mr. Lencheski lived near this office.  Fraga Dep. 10:9-11:5.  Mr. Fraga also knew that Mr. Lencheski was in Pennsylvania while they negotiated the oral agreement over the telephone.  Fraga Dep. 21:23-22:20.  Although Mr. Fraga did not know where Phoenicia employees were located during the weekly telephone conferences between Cosmos, JEG, and Phoenicia, Mr. Fraga knew that Phoenicia did much of its work out of its Bethlehem office. Fraga Dep. 26:17-32:5.  Finally, Phoenicia listed its Bethlehem address on the initial commission invoice, providing Cosmos notice that Phoenicia was operating out of Pennsylvania.  Compl. Ex. 5.  Cosmos subsequently paid Phoenicia its commission, proving that Cosmos saw the invoice and the address listed within.  Compl. ¶ 16.  The record therefore indicates that Cosmos, through its agent Mr. Fraga, knew that Phoenicia was operating principally out of its Bethlehem, Pennsylvania office.

## 2.     Arising out of Contacts

The litigation must also arise out of or relate to at least one of the defendant's contacts with the forum State.  Helicopteros, 466 U.S. at 414.  The Third Circuit "requires a closer and more direct causal connection than that provided by the but-for test . . . the analysis should hew closely to the reciprocity principle upon which specific jurisdiction rests."  O'Connor, 496 F.3d at 323.  If "a meaningful link exists between a legal obligation that arose in the forum and the

12

substance of the plaintiffs' claims," the "arising out of" requirement is satisfied.  Id. at 324.

Here, Phoenicia's claim is for breach of contract, and Cosmos's contacts with Pennsylvania include the negotiations leading to the oral agreement at issue.  A "meaningful link" clearly exists between Cosmos's contact with Pennsylvania and Phoenicia's claim.  As such, the claim "arises out of" Cosmos's contacts with the forum, i.e. Pennsylvania.

### 3.    Fair Play and Substantial Justice

Finally, the Court considers whether the exercise of jurisdiction would "otherwise comport with 'traditional notions of fair play and substantial justice.'" O'Connor, 496 F.3d at 324 (quoting Int'l Shoe, 326 U.S. at 316).  Because Cosmos has minimum contacts with Pennsylvania, it "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable."  Id.

The Supreme Court has identified several factors to consider when deciding whether jurisdiction comports with fair play and substantial justice: "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, [and] the interstate judicial system's interest in obtaining the most efficient resolution of controversies."  Burger King, 471 U.S. at 477.

Cosmos has not presented a compelling case that the Court exercising jurisdiction would be unreasonable.  Although Cosmos claims that it would be burdened by defending the action in Pennsylvania, it does not explain in any detail how it would be burdened.  See Def.'s Br. 9.  This bare assertion is not compelling; indeed, the Third Circuit has asserted jurisdiction when the burden on the defendant was much greater than is the case here.  See, e.g., O'Connor, 496 F.3d at 324-25 (asserting jurisdiction despite the fact that the defendant's representatives had to "travel

13

2,000 miles to litigate in Pennsylvania, and the company must also familiarize itself with a foreign legal system").

Additionally, Cosmos claims that New York would be the most efficient forum because both Cosmos and Phoenicia have offices in that State.  Def.'s Br. 9 (citing Asahi Metal Indus. Co. v. Super. Ct. of Cal., 480 U.S. 102, 112 (1987).  Whatever gains in efficiency may be made by litigating this case in New York instead of Pennsylvania, however, do not rise to the level of concluding this Court's exercise of jurisdiction unfair.  See Burger King, 471 U.S. at 477.  In the Third Circuit, moreover, small gains in efficiency will rarely outweigh the "paramount consideration" accorded to a plaintiff's choice of venue, especially when it has chosen its home forum.  Shutte v. Armco Steel Corp., 431 F.2d 22, 25 (3d Cir. 1970); accord Nat'l Mortg. Network, Inc. v. Home Equity Ctrs., Inc., 683 F. Supp. 116, 119 (E.D. Pa. 1988) ("A plaintiff's choice of forum normally is entitled to great weight.").[4]

Finally, Cosmos suggests that "Pennsylvania does not have a significant interest in furthering its social policies, while New York has a considerable interest in enforcing its Statute of Frauds."  Def.'s Br. 10.  Cosmos has overlooked Pennsylvania's interest in protecting the contractual rights of its residents and their business ventures.  Additionally, New York's interest in enforcing its Statute of Frauds "may be accommodated through application of [Pennsylvania's] choice-of-law rules."  Burger King, 471 U.S. at 477.  Cosmos simply has not made a compelling case that this Court's exercise of jurisdiction would offend "traditional

---

[4] In the alternative, Cosmos suggests that this action should be transferred to the Southern District of New York.  Cosmos's main argument supporting its Motion to Transfer is a bare assertion that New York would be a more convenient location for two key witnesses who live in New York and New Jersey.  Cosmos has failed to adequately demonstrate how these witnesses would be inconvenienced by litigation in Pennsylvania; thus the Motion to Transfer is denied.

notions of fair play and substantial justice." <u>Int'l Shoe</u>, 326 U.S. at 316.

In sum, Cosmos's contacts with Pennsylvania were instrumental in the formation of the oral agreement at issue in this case, and Cosmos could have "reasonably anticipate[d] being haled into court there." <u>World-Wide Volkswagen Corp. v. Woodson</u>, 444 U.S. 286, 297 (1980). Other factors do not render the exercise of jurisdiction unreasonable, nor is the Court persuaded that the litigation should be transferred to the Southern District of New York. Cosmos's Motion to Dismiss is therefore denied insofar as it seeks dismissal for lack of personal jurisdiction or, in the alternative, transfer of venue.

### B. Failure to State a Claim[5]

Cosmos also contends that the Complaint should be dismissed because (1) the oral agreement is barred by the New York Statute of Frauds and (2) the oral agreement is unenforceable because it is indefinite as to its material terms.[6] The New York Statute of Frauds does not bar enforcement of the alleged oral agreement because the agreement was sufficiently memorialized by the March 25th and March 30th email exchange. Additionally, the contract is enforceable as surrounding circumstances provide sufficient clarity as to potentially ambiguous

---

[5] The parties disagree over whether New York or Pennsylvania law applies to the breach of contract claim. The Court need not decide the choice-of-law question because the result would be the same under both Pennsylvania and New York law. <u>See</u> <u>Underhill Inv. Corp. v. Fixed Income Disc. Advisory Co.</u>, 319 F. App'x 137, 140 (3d Cir. 2009) ("Where the laws of the two jurisdictions would produce the same result on the particular issues presented . . . the Court should avoid the choice-of-law question.").

[6] In its reply brief, Cosmos argues for the first time that under the terms of the contract it does not owe any money to Phoenicia because Cosmos did not receive any further revenues as a result of the JEG contract. <u>See</u> Def.'s Reply 9 n.7, 14. While this argument may have merit, the parties have not fully briefed the issue, and thus the Motion to Dismiss will not be granted on this basis. If the parties wish to argue this issue later in the proceedings, they may do so.

material terms.

       **1.**       **Statute of Frauds**[7]

The applicable provisions of the New York Statute of Frauds ("Statute of Frauds")

provide:

> a. Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:
>
>> 1. By its terms is not to be performed within one year from the making thereof . . . ;
>>
>>             \* \* \* \*
>>
>> 10. Is a contract to pay compensation for services rendered in negotiating . . . a business opportunity . . . . "Negotiating" includes procuring an introduction to a party to the transaction or assisting in the negotiation or consummation of the transaction.

N.Y. Gen. Oblig. Law § 5-701 (McKinney 2012).  Here, the contract between Cosmos and

Phoenicia was a contract to "pay compensation for services rendered in negotiating . . . a

business opportunity . . . ."[8]  Id.  However, it is not barred by the statute because it has been

sufficiently memorialized in writing, as will be explained below.

---

[7] The parties agree that enforcement of the oral agreement is not barred by the Pennsylvania Statute of Frauds.  See Def.'s Br. 11-12; Pl.'s Br. 2; see also 33 Pa. Stat. Ann. §§ 1-6 (West 2012) (Pennsylvania's Statute of Frauds).  Therefore, the Court limits its inquiry to the New York Statute of Frauds.

[8] Contrary to Cosmos's contention, the oral agreement could have been performed within one year.  The Statute of Frauds only bars oral agreements "which by their very terms have absolutely no possibility in fact and law of full performance within one year."  D & N Boening, Inc. v. Kirsch Beverages, Inc., 63 N.Y.2d 449, 454 (1984).  In this case, the oral agreement makes no mention of when performance is due; it simply stipulates that Phoenicia would receive 20% of gross revenues in exchange for facilitating negotiations between Cosmos and JEG.

a.      **Compensation for Services Rendered in Negotiating a Business Opportunity**

While New York courts not resolved the scope of what is covered by the term "business opportunity," when "the intermediary's activity is so evidently that of providing 'know-how' or 'know-who', in bringing about between principals an enterprise of some complexity . . . the statute is entitled to be read both in accordance with its plain meaning [and] its evident purpose . . . ." Freedman v. Chem. Constr. Corp., 43 N.Y.2d 260, 267 (1977).

In this case, the Complaint alleges that Phoenicia both introduced the parties to the transaction and facilitated the negotiation of an agreement between them.  In return, Phoenicia was promised compensation in the form of 20% of Cosmos's gross revenues as a result of the transaction.  Because Phoenicia provided both the "know-who" and the "know-how" — the introduction of JEG and Cosmos and the facilitation of an agreement — the term "business opportunity" should be accorded its plain meaning.  The relationship between Cosmos and JEG constituted a business opportunity: JEG would pay Cosmos to participate in various soccer events in the Las Vegas area.

Phoenicia argues that only finders fee contracts are covered by subsection (a)(10) of the Statute of Frauds, and that since Phoenicia participated in negotiations the oral agreement does not constitute a finders fee.  This contention is refuted by both the plain language of the statute and binding precedent.  See N.Y. Gen. Oblig. Law § 5-701(a)(10) ("'Negotiation' includes procuring an introduction to a party to the transaction or assisting in the negotiation or consummation of the transaction."); Freedman, 43 N.Y.2d at 266 ("The historical controversy [of] whether it applied to finders as distinguished from brokers is settled to include both.").

17

The Statute of Frauds thus applies to the oral agreement, as it was a contract to facilitate negotiations for a business opportunity in return for compensation.

b.      **Written Memorandum Requirement**

Because the oral agreement is a contract for negotiating a business opportunity, it is barred by the Statute of Frauds unless a signed written memorandum memorializes its existence. N.Y. Gen. Oblig. Law § 5-701(a).  The memorandum "must contain the whole agreement, and all its material terms and conditions, not indeed in detail and with absolute precision, but substantially, and so that one reading the memorandum could understand from that what the agreement really was."  Drake v. Seaman, 97 N.Y. 230, 233 (1884); see also Steinborn v. Daiwa Sec. Am., Inc., No. 92-0782, 1995 WL 761286, at *3 (S.D.N.Y. Dec. 26, 1995) (quoting same); Lauter v. W & J Sloane, Inc., 417 F.Supp. 252, 258 (S.D.N.Y. 1976) (quoting same).

The March 25th and March 30th emails satisfy the written memorandum requirement of the Statute of Frauds.  See Crabtree v. Elizabeth Arden Sales Corp., 305 N.Y. 48, 54 (1953) ("The statute of frauds does not require the memorandum to be in one document.  It may be pieced together out of separate writings, connected with one another either expressly or by the internal evidence of subject matter and occasion.") (internal alteration and quotation marks omitted).  The March 25th email identifies Cosmos and Phoenicia as the parties to the agreement and establishes that Phoenicia "will receive a 20% commission on gross revenue from the present opportunity for the Las Vegas match event with our client Justice Entertainment Group and Cosmos, as fee for joining the two parties together in a mutually beneficial arrangement for the event."  Compl. Ex. 2.  This email thus contained all of the material terms of the alleged oral agreement.  See Compl. ¶ 9 ("Phoenicia entered into an oral contract with the Cosmos whereby

18

Phoenicia would be paid a 20% commission on gross revenue for putting the Cosmos together with Phoenicia's client JEG to produce soccer events in Las Vegas.").

Cosmos responded with the March 30th email, which stated, "The arrangement below has been reviewed and accepted by our management."  Compl. Ex 2.  This clearly shows that Cosmos manifested assent to the oral agreement.[9]  Both emails contained the typed names of the parties' agents at the end, satisfying the subscription requirement of the Statute of Frauds.  See Stevens v. Publicis S.A., 50 A.D.3d 253, 255-56 (N.Y. App. Div. 2008) (holding that e-mails containing the parties' names at the end constituted signed writings within the meaning of the Statute of Frauds).  The email exchange thus satisfies the written memorandum requirement of the Statute of Frauds.

Nevertheless, Cosmos argues that a key aspect of the oral agreement — the fee owed Phoenicia — is not described with sufficient clarity in the email exchange for it to satisfy the Statute of Frauds.  First, Cosmos claims that the presence of two possible fee structures within the March 25th email creates uncertainty as to the commission Cosmos is obligated to pay Phoenicia.[10]  Rather than create uncertainty, however, this portion of the March 25th email

---

[9] Cosmos argues that the second line of the March 30th email, in which it stated that "[Cosmos] will also need [sic] review the term sheet with you once more before engaging your client in this endeavor," shows that Cosmos had not manifested assent to the oral agreement. Compl. Ex. 2.  The plain language of this line, however, suggests that Cosmos was referring to the pending agreement with Phoenicia's client, JEG, rather than the oral agreement with Phoenicia.

[10]The relevant portion of that email provides:
However, should you become a full time client of Phoenicia, as would be evidenced by agreeing to and signing our proposal for services as sent to you and your executive management on February 17th, then the commission due Phoenicia on the aforementioned transaction will be reduced to 10% on gross revenue as is our common courtesy to existing clients.  The latter opportunity for a reduced

19

created two clearly delineated options: Cosmos could either agree to the February 18 Proposal and pay Phoenicia 10% commission on gross revenue, or Cosmos could reject the February 18 Proposal and pay Phoenicia 20% commission.  Because Cosmos did not agree to the February 18 Proposal, the first option did not apply.  Accordingly, the presence of two possible commission rates therefore did not render the email exchange impermissibly vague.

Cosmos also asserts that because the March 25th email fails to define "gross revenue," it lacks an essential term of the oral agreement.  This argument also fails because the parties' actions support an ordinary reading of "gross revenue".  See Crabtree, 305 N.Y. at 57 (noting that parol evidence is admissible to explain ambiguous terms of a contract in order to satisfy the Statute of Frauds). Namely, when Cosmos received the initial $250,000.00 payment from JEG, Phoenicia billed Cosmos for 20% of that revenue, or $50,000.00.  In these circumstances, there is no reason to believe "gross revenue" meant anything other than its ordinary meaning: income actually received by a company.[11]

The email exchange of March 25th and March 30th thus satisfies the written memorandum requirement of the Statute of Frauds because it identifies the parties and describes

commission for services rendered would need to be exercised within five (5) business days of acceptance of Phoenicia's clients' Las Vegas match event Offer Letter.
Compl. Ex. 2.

[11] Cosmos also argues that "Phoenicia cannot rely on an alleged payment from New York Cosmos to sidestep the need for a written agreement under the Statute of Frauds, because New York law does not recognize an exception to § 5-701 based on partial performance."  Def.'s Br. 18 n.3.  The payment from Cosmos to Phoenicia is not being used to avoid the need for a written agreement under the Statute of Frauds, but rather to provide explanation for material terms, as is appropriate under New York law.  See Crabtree, 305 N.Y. at 57; Marks v. Cowdin, 226 N.Y. 138, 142-44 (1919).

20

the material terms of the agreement: Cosmos would pay Phoenicia 20% commission on gross revenue in exchange for "joining" JEG and Cosmos together in a contract.  As such, enforcement of the oral agreement is not barred by the Statute of Frauds.

### 2.      Contract Indefiniteness

Under both New York and Pennsylvania law, the alleged oral agreement is sufficiently definite with respect to its material terms, and is thus enforceable.  New York courts have "not applied the definiteness doctrine rigidly . . . .  Thus, where it is clear from the language of an agreement that the parties intended to be bound and there exists an objective method for supplying a missing term, the court should endeavor to hold the parties to their bargain." 166 Mamaroneck Ave. Corp. v. 151 East Post Rd. Corp., 78 N.Y.2d 88, 91 (1991).  Similarly, under Pennsylvania law, "[a]n agreement is sufficiently definite if the parties intended to make a contract and there is a reasonably certain basis upon which a court can provide an appropriate remedy." Green v. Oliver Realty, Inc., 363 Pa. Super. 534, 539 (1987).

The oral agreement is sufficiently definite under New York law for analogous reasons to those already articulated with respect to the written memorandum requirement above.  See 166 Mamaroneck, 78 N.Y.2d at 91-92 (explaining that "the requirement of definiteness could be satisfied in the absence of an explicit contract term . . . [by] recourse to an objective extrinsic event").

Similarly, the contract is sufficient under Pennsylvania law because Pennsylvania also allows surrounding circumstances to be used to explain ambiguous terms.  See Westinghouse Elec. Co. v. Murphy, Inc., 425 Pa. 166, 171-72 (1967) ("Especially if evidence of the contract is not an integrated document, and, moreover, one partly or wholly composed of oral

21

communications, the precise content of which is not of record, courts must look to surrounding circumstances and the course of dealings between the parties to ascertain the intention of the parties.") (internal citation omitted).

Again, the phrase "gross revenue" is not ambiguous because the parties' billing and subsequent payment following JEG's initial payment to Cosmos support giving "gross revenue" its ordinary meaning.  Cf. Volunteer Firemen's Ins. Serv., Inc. v. CIGNA Prop. & Cas. Ins. Agency, 693 A.2d 1330, 1339 (Pa. Super. Ct. 1997) ("We will not rewrite the contract or give it a construction that conflicts with the plain, ordinary and accepted meaning of the words used."). Nor was the dual compensation structure indefinite, as the circumstances when each commission rate would apply were clearly specified in the oral agreement.

The material terms of the oral agreement are sufficiently unambiguous; as such, it is an enforceable agreement under both New York and Pennsylvania law.

**VI.    Conclusion**

For the reasons set forth above, Cosmos's Motion to Dismiss is DENIED.  An appropriate Order follows.

22